IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Matthew Smith,                    Case No. 3:17CV1135

      Plaintiff

     v.                               **ORDER**

Sandusky Newspapers, Inc., et al.,

      Defendants

This is a false-arrest case under 42 U.S.C. § 1983.

In June, 2016, Detective John Powell, of the Sandusky, Ohio, Police Department, arrested plaintiff Matthew Smith without a warrant.

The charge – felony theft – alleged that Smith had stolen checks from his employer, directed an accomplice to cash them, and used the proceeds for his own, unauthorized purposes. But the principal witnesses against Smith had lied to Sandusky officers, changed parts of their stories multiple times, and, by all appearances, seemed equally, if not more, plausible suspects. Powell disclosed none of that when, the next day, he obtained an arrest warrant for Smith from the Clerk of the Sandusky Municipal Court.

Thereafter, the City's newspaper, the Sandusky Register, published an article about Smith's arrest that included a statement by Powell definitively identifying Smith as the culprit. When, some months later, the City dismissed the charge against Smith for "lack of evidence," the newspaper refused to amend the article by noting the dismissal.

Smith now brings claims for: 1) false arrest against the City of Sandusky and Powell; 2) libel, slander, failure to publish a correction, and intentional infliction of emotional distress against The Register, Register reporter Courtney Astolfi and editor Matthew Westerhold, and Powell; and 3) slander and RICO violations against Raymond Young and Troy Shipman, the witnesses who fingered Smith. He also seeks declaratory and injunctive relief from The Register's policy of publishing "slanderous and defamatory statements from law enforcement officials." (Doc. 19 at ¶101).[1]

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367(a).

Pending is the City and Powell's motion for judgment on the pleadings. (Doc. 15). For the following reasons, I deny the motion.

**Background**

In early May, 2016, Steve Akers, the owner of Davis and Pinchot Investments, LLC (DPI), reported a theft to the Sandusky Police Department. (*Id.* at ¶11). The theft arose from the unauthorized cashing of two checks, each in the amount of $4,000. (*Id.*). Lieutenant Danny Lewis worked the case for the Department. (*Id.* at ¶13).

**A. The Investigation**

Akers told Lt. Lewis that he intended to use the checks to pay the company's landfill contractor. He explained that Smith – a supervisor who had worked for DPI for more than eight years (*id.* at ¶45) – gave the checks to Troy Shipman, apparently an employee of the landfill company, to pay those expenses.

---

[1] Plaintiff's opposition brief discusses a common-law false-arrest claim, but no such claim is in the amended complaint or, thus, properly before the court.

Per company policy, the payee line on each check and the amount owed were left blank. Ordinarily the landfill company would fill in the amount owed and its name on the DPI checks and issue receipts to DPI. In this case, however, someone had made the checks out to "Ray Young," a DPI employee, and cashed them at the First National Bank of Bellevue. (*Id.* at ¶12).

Akers told Lewis that "he believed Troy Shipman gave Raymond Young the checks to cash, whereupon the duo absconded with the money." (*Id.* at ¶18).

After speaking with Akers, Lt. Lewis interviewed Young. Young claimed that Smith had given him the checks, told him they were for DPI's petty-cash fund, and asked Young to cash the them because Smith did not have an ID. (*Id.* at ¶19). After Smith had given him the checks, Young continued, Smith would drive him to the bank and take the cash that Young obtained from the bank.

During this same interview, Young contradicted himself by saying that "the person who picks up the trash for DPI" – that is, Shipman (*see id.* at ¶¶21–22) – both "gave him the checks" and then "drove him to the bank to cash the checks." (*Id.* at ¶20).

Lt. Lewis obtained surveillance footage from the First National Bank that contradicted Young's original claim and confirmed his latter, altered claim. This footage showed Young cashing checks on April 16 (the date of the first check-cashing incident) and May 3 (the date of the second incident). On both days, Young arrived at the bank in a vehicle belonging to Shipman. (*Id.* at ¶24).

When Lewis interviewed Young a second time, Young reiterated that it was Smith who had given him the checks, but that it was Shipman who drove him to the bank. (*Id.* at ¶25).

Lt. Lewis then interviewed Smith, who explained that he had given the checks to Shipman, not Young. Surveillance footage recorded at DPI's office corroborated this account: it depicted

Smith handing the two checks at issue to Shipman. (*Id.* at ¶¶26–27). Smith also let Lewis examine his cell phone records, which showed no calls made between him and Young. (*Id.* at ¶29).

Lewis next interviewed Shipman. According to Shipman, "Smith would give him checks in the morning, but before [Shipman] could get to the landfill, Smith would contact him and meet him somewhere." (*Id.* at ¶30). "Smith would then ask for the check back and give [Shipman] cash to pay the land fill." (*Id.*). Shipman also admitted that he drove Young to the bank "on several occasions," but denied knowing that Young was cashing checks. (*Id.* at ¶31).

Sometime in June, 2016, Detective Powell became involved in the investigation. When Powell interviewed Shipman, Shipman admitted that "he knew . . . Young was cashing checks when he drove him to the bank." (*Id.* at ¶32). Shipman also volunteered that Smith was "running an 'insurance scam.'" (*Id.* at ¶33).

Finally, Powell obtained a handwriting sample from Smith, but not from Young or Shipman. Smith's sample "rule[d] him out as the person who wrote Raymond Young's name" on the payee line of the stolen checks. (*Id.* at ¶¶34–36).

### B. Arrest and Dismissal of Charges

On June 14, Detective Powell arrested Smith, without a warrant, on one count of felony theft. The next day, Powell obtained an arrest warrant from a clerk at the Sandusky Municipal Court. (Doc. 31–1 at 1). Powell's affidavit in support of the complaint against Smith asserted that, "[d]uring the course of an investigation it was learned that [Smith] did steal (7) checks from [DPI] and cashed them in the amount of $22,000[.]" (*Id.*).[2]

---

[2] During the investigation, Akers discovered that someone had improperly cashed an additional five checks totaling $14,000.

4

When Jared Davis, a managing member of DPI, learned of Smith's arrest, he called Detective Powell and said it was "wholly unreasonable" to believe Smith stole the checks. (*Id.* at ¶45). According to Davis, Smith had handled "hundreds of thousands of dollars in collected rent payments without incident" during his tenure with DPI. (*Id.* at ¶45).

In mid-August, the City dismissed the theft charge "due to a lack of evidence." (*Id.* at ¶46).

### C. The Article

One day after Smith's arrest, the Sandusky Register published an article on its website with the headline "Man steals $22K from Sandusky rental business." (*Id.* at ¶40). The article, which Astolfi wrote and Westerhold edited, included Smith's name and photograph. It quoted Detective Powell as saying that Smith "basically duped a tenant into cashing checks – he took advantage of him." (*Id.* at ¶43).

After the City dismissed the charge against Smith, Davis called Astolfi and asked her to redact the article "because it was untrue and harming [Smith's] and DPI's reputation in the local community." (*Id.* at ¶47). The online version of the article "received a high volume of comments that were critical . . . and . . . indicated that the charges [against] Smith had been dismissed." (*Id.* at ¶49).

Astolfi said "she was aware of the dismissal and would update the story to reflect that the charges had been dismissed." (*Id.* at ¶48). Instead of doing so, however, Astolfi caused the newspaper to publish "an identical article" with a revised headline that read "Shiloh man charged for $22K theft." (*Id.* at ¶50). The "Shiloh man" was Smith, and the new article again included his name and photograph, but did not mention the dismissal. In the meantime, the Register "deleted negative reader comments that were critical of the article[.]" (*Id.* at ¶51).

Davis followed-up with Astolfi and Westerhold in mid-December about the promised correction, but neither responded to him. (*Id.* at ¶¶52–53). As of the filing of this suit – and, indeed, as of the filing of this order – the "Shiloh man" article remains available on the Register's website and does not mention the dismissal. (*Id.* at ¶¶54–55).

## Standard of Review

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007).

## Discussion

The City Defendants contend they are entitled to judgment as a matter of law on Smith's claims for false arrest, libel, and slander.[3]

As to the false-arrest claim, defendants contend that the allegations in Smith's complaint establish probable cause for his arrest. For that reason, defendants argue, they are entitled to qualified immunity. They also contend that the warrant Powell obtained after the arrest defeats Smith's Fourth Amendment claim.

Regarding the state-law claims for libel and slander, Powell contends that his statements to the Sandusky Register are privileged under *Hahn v. Kotten*, 43 Ohio St. 2d 237 (1975). Powell further argues that he is entitled to public-employee immunity under O.R.C. § 2744.01, *et seq.*

---

[3] Defendants make no argument with respect to the claims against Powell for intentional infliction of emotional distress and failure to publish a correction, so I do not discuss them.

### A. False Arrest

To state a claim under § 1983, Smith must allege "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

Here, Smith's § 1983 claim alleges false arrest in violation of his Fourth Amendment rights.

"To state a claim of false arrest, a plaintiff must prove that the arresting officer lacked probable cause to arrest h[im]." *D.D. v. Scheeler*, 645 F. App'x 418, 424 (6th Cir. 2016). "Probable cause is reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Id.*

"A police officer has probable cause only when he discovers *reasonably reliable information* that the suspect has committed a crime." *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (emphasis in original). "[I]n obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence." *Id.* "Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest." *Id.*

### 1. Probable Cause

Accepting Smith's allegations as true and viewing them in the light most favorable to him, I conclude that the complaint states a plausible claim for false arrest.

Based on his and Lt. Lewis's investigation, Powell knew all of the following when he arrested Smith without a warrant.

First, Akers, Smith's employer for more than eight years, doubted that Smith was responsible for the theft. Rather, Akers cast his suspicions on Young and Shipman.

Second, security footage from inside the DPI offices showed Smith giving the checks at issue to Shipman.

Third, Young offered conflicting accounts as to who delivered the checks to him and who took him to the bank to cash them. During his interview with Lt. Lewis, Young maintained that it was Smith who both gave him the checks and drove him to the bank. Moments later, however, Young remembered that it had, in fact, been Shipman who gave him the checks and took him to First National. But when Lewis interviewed Young a second time, Young changed his story once more, settling on Smith as the person who delivered the checks.

Fourth, surveillance footage from the First National Bank showed Young arriving at the bank on two occasions in a vehicle that belonged to Shipman. (This raises the question of what Shipman was doing taking Young to the bank, if, as Young and Shipman alleged, Smith, rather than Shipman, gave the checks to Young).

Fifth, Shipman's claim that Smith would initially give him a DPI check, only to ask for it back later – presumably so that he could deliver it to Young and Young could cash it – conflicted with Young's earlier claim that Shipman had given him the checks.

Sixth, Shipman lied about knowing whether Young was cashing checks at First National. He initially told Lt. Lewis he had no idea what Young was doing at the bank, but then admitted to Detective Powell that "he knew . . . Young was cashing checks[.]" (*Id.* at ¶32).

In light of all this, a reasonable police officer ought to have understood that Young and Shipman manifestly had a motive to pin the thefts on someone else – to wit, Smith. Shipman had indisputably gotten the checks at the DPI offices, he and Young had indisputably gone to the bank together, and Young indisputably had obtained the cash. Nevertheless, Powell concluded, on the

8

basis of Young's and Shipman's internally inconsistent and contradictory accounts, that he had probable cause to arrest Smith.

To be sure, as the City defendants emphasize, eyewitness accounts can provide "ample probable cause." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999).

But as *Ahlers*, *supra*, 188 F.3d at 370, also makes clear, eyewitness accounts will not establish probable cause if "there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection" of the events in question.

Smith's complaint plausibly invokes these exceptions – namely, that there was reason to think Young and Shipman were lying, and that neither had accurately described the events at issue.

To begin, Young and Shipman had changed multiple parts of their stories – how Young got the checks, who took Young to the bank, and what Shipman knew about Young's activities at the bank – multiple times during the investigation. Indeed, Young offered three different iterations of the events, all of which were inconsistent. Moreover, Young's claim that Smith drove him to the bank was a lie: surveillance footage showed Shipman, not Smith, dropping Young off at the bank. And it is beyond peradventure that Shipman lied when he denied knowing that Young was cashing checks at the bank.

Young's and Shipman's accusations were the only evidence implicating Smith, but their accusations were ever-shifting, untruthful in significant part, and at times mutually contradictory. In light of the duo's prevarications, Powell's alleged failure to consider the extent to which Young and Shipman had a compelling motive to lie and shift the blame borders on the inexplicable. *See*

*Ahlers*, *supra*, 188 F.3d at 370 (eyewitness accounts do not establish probable cause if "there is an apparent reason for the officer to believe that the eyewitness was lying").

Because Smith has plausibly alleged that the information known to Detective Powell at the time of the arrest did not establish probable cause, the City defendants are not entitled to qualified immunity. *E.g.*, *Greer v. City of Highland Park*, --- F.3d ----, 2018 WL 1122290, *2–3 (6th Cir.) (rejecting police officers' qualified-immunity defense where plaintiffs plausibly alleged that officers' search of their home violated the Fourth Amendment).[4]

### 2. Effect of the Warrant

Ordinarily, "an arrest based on a facially valid warrant approved by a magistrate provides a complete defense" to a false-arrest claim. *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).

But no such defense is available if the officer "knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create[d] a falsehood and such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Id.* (brackets in original).

The City defendants cannot avail themselves of this defense, however, because the warrant – obtained only after the fact to justify an arrest made without probable cause – is doubly defective.

First, Powell's affidavit in support of the warrant is just like the conclusory, bare-bones affidavit that the Sixth Circuit condemned as "foundation-less" and improper in *Graves v. Mahoning Cnty.*, 821 F.3d 772, 775 (6th Cir. 2016).

---

[4] The defendants' qualified-immunity defense addresses only the first prong of the defense – i.e., whether probable cause existed. They do not dispute that arresting Smith without probable cause would violate clearly established law. (*See* Doc. 15 at 6–8; Doc. 31 at 1–5).

In *Graves*, the plaintiff alleged that a court clerk issued an arrest warrant based on an affidavit alleging only that she "did knowingly aid or abet another in the sale of . . . cocaine base . . . in violation of Section 2925.03 of the Ohio Revised Code." *Id.* As the Circuit explained, that complaint provided the issuing clerk with "none of the operative facts in the case," and thus the clerk "had no foundation for her probable cause judgment[.]" *Id.* (bracket in original).

Powell's affidavit here is essentially identical to the defective application in *Graves*. It alleged only that "[d]uring the course of an investigation it was learned that [Smith] did steal (7) checks from [DPI] and cashed them in the amount of $22,000[.]" (Doc. 31–1 at 1). And the affidavit provided: 1) no reason to think that Smith, as opposed to someone else – namely Young and/or Shipman – committed the theft; and 2) no description of how he did so. It was simply a "foundation-less" conclusion that Smith committed an offense.

Accordingly, the warrant is not "facially valid" and cannot defeat Smith's false-arrest claim.

Second, Smith's complaint plausibly alleges that Powell displayed a reckless disregard for the truth by omitting any mention of Young's and Shipman's shifting accounts of the thefts.

Not only did Powell fail to make an affirmative case for arresting Smith, but omitting these critical details – Young's and Shipman's lies about Smith allegedly driving Young to the bank, and Shipman's alleged ignorance of what Young was doing at the bank, among others – would have deprived a neutral and detached magistrate of the foundation she needed, and to which she was entitled, to decide whether there was probable cause to arrest Smith. *See Franks v. Delaware*, 438 U.S. 154 (1978).

Because Young and Shipman were the only witnesses to implicate Smith, the inconsistencies and contradictions in their accounts would have been material to the probable-cause determination

11

(had Powell in fact attempted to justify the arrest with something more than a "foundation-less" conclusion). The complaint therefore generates a plausible inference that Powell recklessly omitted critical information undermining Young's and Shipman's credibility, and the post hoc warrant does not defeat Smith's false-arrest claim.

## B. Defamation Claims

To state a defamation claim under Ohio law, whether libel or slander, the plaintiff must allege "(1) a false statement, (2) about the plaintiff, (3) was published without privilege to a third party, (4) with fault or at least negligence on the part of the defendant, and (5) the statement was either defamatory per se or caused special harm to the plaintiff." *Savoy v. Univ. of Akron*, 2014-Ohio-3043, ¶18 (Ohio App.).

In his libel claim, Smith alleges that Powell caused the Sandusky Register to publish a false statement that he "stole $22,000 from his employer[.]" (Doc. 19 at ¶¶61–62). In the slander claim, Smith alleges that Powell said that Smith "basically duped a tenant into cashing checks – he took advantage of him," and that Powell "was able to track the theft of the stolen checks back to [Smith]." (*Id.* at ¶¶78–79).

### 1. Privilege

Powell contends that he is entitled to judgment as a matter of law because his statements to the Sandusky Register were privileged.

A defendant in a libel action "may invoke the defense of qualified privilege." *Taylor Bldg. Corp. of Am. v. Benfield*, 507 F. Supp. 2d 832, 841 (S.D. Ohio 2007).

"A publication is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where

his interest is concerned." *Id.* (quoting *Hahn*, *supra*, 43 Ohio St. 2d at 244). "The essential elements of a privileged communication are as follows: (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Id.*

In this case, Smith's complaint supports a plausible inference that Powell did not make the challenged statements in "good faith."

Rather, as I explained while discussing the false-arrest claim, there were substantial reasons to doubt the credibility of Young and Shipman, and thus substantial reasons for a prudent officer not to make a blanket statement laying all blame for the crimes at Smith's feet. As already discussed, both Young and Shipman lied to police, changed their stories multiple times, and even contradicted one another's accounts.

It may well be that there is some reason why Powell was apparently so one-sided in his evaluation of the evidence and decision to arrest Smith. But whether that is so, such that Powell made his statements to the newspaper in "good faith," is not an issue I can decide on the pleadings, particularly where the complaint plausibly alleges reckless or deliberate omissions in Powell's application for a warrant.

## 2. Immunity

The same analysis holds for Powell's immunity defense under O.R.C. § 2744.03(A)(6)(b), which provides that a public employee is immune from a tort suit unless, *inter alia*, "[h]is acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." As already explained, the complaint yields a plausible inference that Powell acted in bad faith, or in reckless

13

disregard for the truth, in arresting Smith, securing the warrant, and speaking about Smith's case. Accordingly, he is not entitled to statutory immunity as a matter of law.

## Conclusion

It is, therefore,

ORDERED THAT the City defendants' motion for judgment on the pleadings (Doc. 15) be, and the same hereby is, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge